IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

RALPH PRENDES,

       Plaintiff,

vs.                            CASE NO. 1:15-cv-171-MP-GRJ

CAROLYN W. COLVIN,
Acting Commissioner of
Social Security

       Defendant.

_____/

## REPORT AND RECOMMENDATION

Plaintiff appeals to this Court from a final decision of the Acting

Commissioner of Social Security (the "Commissioner") denying Plaintiff's

application for disability insurance benefits ("SSDI") and supplemental

security income ("SSI") benefits pursuant to Title II and Title XVI,

respectively, of the Social Security Act ("the Act"). (ECF No. 1.) The

Commissioner has answered (ECF No. 9), and both parties have filed

briefs outlining their respective positions. (ECF Nos. 14–15.) For the

reasons discussed below, it is recommended that the Commissioner's

decision be affirmed.

# I.  PROCEDURAL HISTORY

Plaintiff protectively filed his application for SSDI and SSI on
September 21, 2011, alleging a disability onset date of March 20, 2008. (R.
312–19.) Plaintiff alleged several impairments, including back pain,
migraines, high blood pressure, attention deficit hyperactive disorder,
depression, a fractured heel and difficulty walking, and difficulty using his
right hand. (R. 337.) His application was denied initially and upon
reconsideration. (R. 169–92.)  At a hearing on February 27, 2014, Plaintiff
agreed to amend his disability onset date to August 28, 2009, the date of
his fiftieth (50) birthday. (R. 82.) Following the hearing, an administrative
law judge ("ALJ") issued a decision unfavorable to Plaintiff. (R. 25–45.) The
Appeals Council denied Plaintiff's request for review. (R. 1–7.)  On August
14, 2015, Plaintiff filed the instant appeal. (ECF No. 1.)

# II.  STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by
substantial evidence. *See* 42 U.S.C. § 405(g) (2000). Substantial evidence
is more than a scintilla, i.e., the evidence must do more than merely create
a suspicion of the existence of a fact, and must include such relevant
evidence as a reasonable person would accept as adequate to support the

conclusion. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing

*Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982), *Richardson v.*

*Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971));

*accord Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

Where the Commissioner's decision is supported by substantial

evidence, the district court will affirm, even if the reviewer would have

reached a contrary result as finder of fact, and even if the reviewer finds

that the evidence preponderates against the Commissioner's decision.

*Edwards*, 937 F.2d at 584 n.3; *Barnes v. Sullivan*, 932 F.2d 1356, 1358

(11th Cir. 1991). The district court must view the evidence as a whole,

taking into account evidence favorable as well as unfavorable to the

decision. *Foote*, 67 F.3d at 1560; *accord Lowery v. Sullivan*, 979 F.2d 835,

837 (11th Cir. 1992) (holding that the court must scrutinize the entire

record to determine reasonableness of factual findings); *Parker v. Bowen,*

793 F.2d 1177 (11th Cir. 1986) (finding that the court must also consider

evidence detracting from evidence on which the Commissioner relied).

However, the district court will reverse the Commissioner's decision on

plenary review if the decision applies incorrect law, or if the decision fails to

provide the district court with sufficient reasoning to determine that the

Commissioner properly applied the law. *Keeton v. Dep't Health & Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994).

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416(I), 423(d)(1); 20 C.F.R. § 404.1505 (2015).[1] The impairment must be severe, making Plaintiff unable to do his previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505–404.1511.

The ALJ must follow five steps in evaluating a claim of disability. 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. *Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991). First, if a claimant is working at a substantial gainful activity, he is not disabled. 20 C.F.R. § 404.1520(b). Second, if a claimant does not have any impairment or combination of impairments which significantly limit his physical or mental

---

[1] All further references to 20 C.F.R. will be to the 2015 version, unless otherwise specified.

ability to do basic work activities, then he does not have a severe

impairment and is not disabled. 20 C.F.R. § 404.1520(c). Third, if a

claimant's impairments meet or equal an impairment listed in 20 C.F.R.

Part 404, Subpart P, Appendix 1, he is disabled. 20 C.F.R. § 404.1520(d).

Fourth, if a claimant's impairments do not prevent him from doing past

relevant work, he is not disabled. 20 C.F.R. § 404.1520(e). Fifth, if a

claimant's impairments (considering his residual functional capacity

("RFC"), age, education, and past work) prevent him from doing other work

that exists in the national economy, then he is disabled. 20 C.F.R. §

404.1520(f).

The burden of proof regarding the plaintiff's inability to perform past

relevant work initially lies with the plaintiff. *Walker v. Bowen*, 826 F.2d 996,

1002 (11th Cir. 1987); *see also Doughty v. Apfel*, 245 F.3d 1274, 1278

(11th Cir. 2001). The burden then temporarily shifts to the Commissioner to

demonstrate that "other work" which the claimant can perform currently

exists in the national economy. *Doughty*, 245 F.3d at 1278 n.2.[2]

_____

[2] In *Doughty* the court explained this burden shifting as follows:

In practice, the burden temporarily shifts at step five to the
Commissioner. The Commissioner must produce evidence that
there is other work available in significant numbers in the

## III.  SUMMARY OF THE RECORD

### A.  Medical Evidence

Plaintiff's medical records begin in August 2006, when he treated with Stephanie Swords, D.O., through May 2007 for low back pain. (R. 424–37.) In March 2007, Dr. Swords referred Plaintiff to Stephen Reintjes, M.D., at Liberty Orthopaedics to be evaluated for bilateral knee and shoulder pain. Plaintiff had an MRI scan of his lumbar spine, which showed a central and right sided L2–3 disc herniation and a broad-based L4–5 disc herniation. A second MRI of the lumbar spine in May 2007 revealed multilevel degenerative changes most notable at L2–3, L3–4, and L4–5. There was also moderate canal stenosis at L2–3 and L4—5 and right paracentral disc protrusion at L2-3 producing mild lateral recess compromise. (R. 539.)

Plaintiff began treating with Boulware Medical Clinic in July 2007.

---

national economy that the claimant has the capacity to perform.  In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.

*Id.* (internal citations omitted).

Plaintiff wanted to talk about methadose and had questions about his bi-
lateral arm numbness. (R. 452.) Plaintiff reported feeling a lot better in
September 2007 since he began taking methadose. (R. 451.) At an
appointment on March 3, 2008, Plaintiff reported having a migraine and
throwing his back out shoveling snow three or four days earlier. (R. 445.)
Plaintiff also had questions about disability. (*Id.*) A few weeks later, Plaintiff
requested refills on his pain medications and the nurse noted that Plaintiff
was stressed because he had been doing a lot of physical work lately. (R.
442.) Plaintiff was assessed with hypertension, anxiety, and chronic back
pain. (*Id.*)

Plaintiff reported to Chiefland Medical Center ("Chiefland MC") on
September 18, 2008, stating that he thought he broke his wrist early that
morning. (R. 443.) Chiefland MC subsequently referred him to the
Emergency Department at Shands ("Shands ED"). (R. 454.) Plaintiff was in
no acute distress but had a limited range of motion of the right wrist
secondary to pain. (*Id.*) Shands ED assessed Plaintiff with a right distal
radius fracture. (*Id.*)

Chiefland MC also referred Plaintiff to Christopher Leber, M.D., for
physiatric evaluation and management. (R. 456, 494, 499.) At the

evaluation on October 7, 2008, Plaintiff reported his pain as mostly in the

lumbar spine radiating to his legs. (R. 456) The pain also refers to his

shoulder, right arm, neck, and legs. (*Id.*) His symptoms started in the

1970s, gradual in onset and continuous since then. (R. 456, 499.)

Plaintiff's pain is severe with characteristics that vary from time to time.

(*Id.*) Plaintiff stated that sitting, standing, walking, driving, lifting, laying

down, bending, twisting, and coughing makes his pain worse. (*Id.*) The only

procedures that make his pain better are lying on his right side with pillows

between his knees and medications. (*Id.*) Plaintiff's current medications

included Imitrex, Slow Mag, eye caps, calcium, multi-vitamin, Methadone,

Hydrocodone, Diazepam, Lotrel, Oxycodone, and Topomax. (R. 457.)

Despite Plaintiff's pain, he denied having issues with self-care and mobility.

(*Id.*) Plaintiff also noted that his hobbies included "music, reading, camping,

boating, [and] hiking." (R. 500.)

On examination, Plaintiff had mild limited range of motion with

flexion/extension of the lumbar spine. (R. 457.) There was no crepitus,

however, and Plaintiff maintained active movement in all four extremities.

(*Id.*) Plaintiff was able to fully squat and could go from sitting to standing

with discomfort but without difficulty. (*Id.*)

Plaintiff returned for a follow-up with Dr. Leber on November 21, 2008, at which time Plaintiff reported having increased function and range of motion following his right distal radius fracture. (R. 487, 505.) He stated that he may be ready to return to work. (*Id.*) Dr. Leber assessed Plaintiff with L2–3 disk herniation and L4–5 disk herniation per Dr. Reintjef's record, a history of migraine headaches, chronic low back pain, impaired gait, symptoms of radiculopathy versus neuropathy in bilateral lower extremities and right arm, a history of melanoma and basal cell carcinoma, a right broken wrist, hypertension, and muscle spasms. (R. 488, 503.)

At his visit with Dr. Leber on February 9, 2009, Plaintiff denied any new medical problems or injuries and reported having a stable month. (R. 481, 511.) Plaintiff informed Dr. Leber that his dental lab was up and running and that he was trying to establish a clientele. (*Id.*)

Then, on April 28, 2009, Plaintiff fell off a ladder and injured his right foot. He went to Shands ED, where he was diagnosed with a comminuted right calcaneal fracture consistent with a Sanders II-A classification. (R. 475, 517, 581, 585.) He also had an x-ray taken of his lumbar spine, which

showed mild degenerative spondylosis. (R. 475, 517, 583.)

The following day Plaintiff went to his follow-up with Dr. Leber and told Dr. Leber that the Methadone he prescribed was not helping. (R. 475, 517.) Accordingly, Dr. Leber discontinued the Methadone and prescribed a trial of OxyContin. (R. 476, 516.)

On May 27, 2009, Plaintiff returned to Dr. Leber, frustrated and upset about his current pain level. (R. 473, 519.) Plaintiff requested an increase in Roxicodone and reported that the OxyContin caused agitation and insomnia. (*Id.*) Dr. Leber discontinued the OxyContin but refused to change the Roxicodone prescription until Plaintiff provided further documentation on his musculoskeletal problems. (R. 474, 518.)

At Plaintiff's June 26, 2009 follow-up with Dr. Leber, Plaintiff requested two additional Oxycodones each day to help in the morning and at night time for sleep. (R. 470, 521.) Plaintiff stated that he currently takes Oxycodone 15 mg six times per day. (*Id.*) Dr. Leber opined that Plaintiff was anxious and in mild discomfort. (R. 471, 521.) The assessment noted that Dr. Leber reviewed MRI records obtained from Plaintiff's former treating physician in Missouri, which revealed normal findings despite

Plaintiff's complaint of right knee pain. (R. 472, 520.) Regardless, Dr. Leber increased Plaintiff's Roxicodone prescription. (*Id.*)

Plaintiff nonetheless continued to gain licenses and certifications for his dental lab. (R. 469, 523.) At his next follow-up in August 2009, Plaintiff reported an overall stable month. (R. 467, 525.) Plaintiff also informed Dr. Leber that he would be traveling to Arkansas to sell his home but would be back in time for his next follow-up with Dr. Leber. (*Id.*)

Plaintiff next reported sustaining a lumbar strain in October 2009, which severely increased his pain in the lumbar spine region. (R. 463, 528.) Dr. Leber denied Plaintiff's request for stronger pain medication because Dr. Leber could not prescribe anything stronger than the medication Plaintiff was already taking. (*Id.*) The pain caused Plaintiff to report to the emergency room for evaluation. (*Id.*) Nonetheless, Plaintiff also informed Dr. Leber that he was going on a trip to Atlanta and North Carolina by car to be part of an education course on thermal plastic dentures. (*Id.*)

On November 14 and 16, 2009, Plaintiff called Dr. Leber, stating that he was in severe pain. (R. 461, 530.) Plaintiff missed his follow-up

appointment with Dr. Leber because he was unable to move to a vehicle due to the pain. (R. 556.) Thus, he reported to Shands ED on November 20, 2009, complaining of nausea, bloody diarrhea, and vomiting. (*Id.*) Plaintiff told Shands ED that he was a chronic pain patient but decided he wanted to quit narcotics cold turkey. (*Id.*) He did not restart his pain medication when his symptoms began because he ran out of medication. (*Id.*) Plaintiff's physical examination, however, was benign in nature. (R. 557.) Plaintiff was assessed with gastrointestinal bleeding, narcotic withdrawal, acute exacerbation of chronic pain, and abdominal pain. (R. 560.) Shands ED gave Plaintiff Morphine and Phenergan, as well as an Oxycodone prescription, and discharged Plaintiff. (*Id.*)

Plaintiff brought the Shands ED records to Dr. Leber's office on November 23, 2009, asking for another medication increase. (*Id.*) Dr. Leber opined that Plaintiff looked uncomfortable, did not make eye contact, was somewhat confrontational in his manner, and was slurring his words. (*Id.*) Plaintiff also was not wearing his orthotic boot on his right foot or ambulating with assistance of crutches or a cane. (*Id.*) Dr. Leber noted that Plaintiff was able to go from sitting to standing, but with discomfort. (*Id.*) A

drug screen tested positive for benzodiazepines and Oxycodone. (R. 462, 531.) Dr. Leber noted that Plaintiff was not using his medications as prescribed and has been abusive to staff on the phone. (*Id.*) Due to the misuse of medications, Dr. Leber referred Plaintiff to Dr. Pagano at Shands UF Pain Management. (*Id.*)

Plaintiff began treating with Mitch Fearing, M.D., P.A., for back pain on December 8, 2009. (R. 605.) On the medical history form Plaintiff listed chronic back pain, chronic cluster migraines, and chronic joint pains as his current medical problems. (R. 699.) Plaintiff also wrote that he gets daily exercise from playing drums and sit ups. (R. 701.) Dr. Fearing diagnosed Plaintiff with chronic pain syndrome, hypertension, and hernia. (R. 606.) For Plaintiff's hypertension, Dr. Fearing prescribed Norvasc 10 mg and Accupril 20 mg, both with refills. (R. 607.) For Plaintiff's pain, Dr. Fearing prescribed, Fiorinal 325 mg, Methadone 10 mg, Valium 10 mg, Roxicodone 15 mg, and Dilaudid 4 mg, all without refills. (R. 607–08.) Over the next eighteen months, Dr. Fearing refilled Plaintiff's pain medication prescriptions and introduced several others, including Soma, Oxycontin, Opana, and Morphine. (R. 608–36.)

Plaintiff returned for a follow-up visit with Dr. Fearing on April 29, 2010. (R. 639, 666.) Plaintiff stated that the methadone has not worked well for him and he has some bad side effects. (*Id.*) The Roxicodone, however, was working well and Plaintiff told Dr. Fearing that he had good results with continued release Oxycontin in the past. (*Id.*) Physical examination was relatively benign and Dr. Fearing noted that Plaintiff was only in mild distress at rest. (*Id.*) Plaintiff did have some difficulty, however, walking into the room because of pain. (*Id.*)

On July 19, 2010, Dr. Fearing also began prescribing Plaintiff Fioricet for migraines. (R. 622.) But, after Plaintiff reported to Shands ED in March 2011 for a migraine, Dr. Fearing changed Plaintiff's migraine medication to Maxalt-Mlt 10 mg. (R. 549, 555, 629.)

Lance Chodosh, M.D., performed a consultative examination of Plaintiff on February 14, 2012. (R. 706–13.) Plaintiff told Dr. Chodosh that surgical treatment is being contemplated. (R. 710.) He also said he uses a cane to take the pressure of his legs and cannot walk more than a few feet without it. (*Id.*) Plaintiff reported that his heel is still painful from his right calcaneus fracture in 2009 and affects his gait. (*Id.*) Plaintiff stated that he

was incapacitated due to his headache pain ten days last year. (*Id.*)

Plaintiff told Dr. Chodosh that he stopped working in the dental lab after

having a disagreement with his employer and was then unable to return to

work because of a loss of motor skills. (*Id.*) He further reported being able

to perform activities of daily living, although with great effort and difficulty.

(*Id.*) He can only walk and stand for fifteen minutes due to pain and he

cannot sit comfortably for more than an hour. (*Id.*) Plaintiff can use his

hands, but with difficulty, and can drive short distances. (R. 711.) At the

time of the examination, Plaintiff was taking Diazepam, Morphine,

Oxycontin, Imitrex, Topamax, and Amlodipine. (*Id.*)

Dr. Chodosh's examination revealed mild to moderate pain behavior,

which limited the functional assessment. (*Id.*) There was no deformity,

tenderness, or paraspinal muscular spasm in his back/spine. (R. 712.)

Plaintiff's straight leg raise was negative, both supine and sitting bilaterally.

(*Id.*) Range of motion in the neck was decreased by pain, but the

assessment could not be completed because Plaintiff complained of pain

and requested that it be stopped. Plaintiff also did not give good effort on

shrug to test neurologic functions. (*Id.*)  Nonetheless, his motor function

was grossly normal and all four extremities had 5/5 strength, including grip. (*Id.*) Manual dexterity was normal and Plaintiff had good coordination. (*Id.*) Plaintiff's standing balance was normal but he walked slowly with small, painful steps. (*Id.*) Plaintiff could not walk on his heels or toes or squat and rise. (*Id.*) He could walk, however, without using an assistive device. (*Id.*)

Plaintiff's bilateral range of motion throughout his body was normal other than the lumbar spine and right great toe. (R. 706–08.) A normal range of motion in the lumbar spine during forward flexion is zero to 90 degrees, but Plaintiff only reached 80 degrees. (R. 706.) Similarly, during lumbar extension, the normal range is zero to 25 degrees, but Plaintiff only reached 15 degrees. (*Id.*) In his right great toe, Plaintiff only reached 10 degrees, while the normal range of motion is zero to fifty degrees. (R. 708.)

Dr. Chodosh assessed Plaintiff with chronic pain of uncertain etiology, complicated by iatrogenic opiate dependency, without objective physical signs of impairment, and a history of cluster headaches. (R. 713.) Dr. Chodosh also recommended that a psychological assessment be performed. (*Id.*) Based only on objective evidence, Dr. Chodosh opined that Plaintiff can "stand, walk, sit, and bend at the waist," and "squat, knee,

lift, carry, [and] handle objects." (*Id.*)

On February 22, 2012, Plaintiff underwent a consultative psychological evaluation with Diana Benton, PsyD. (R. 713–18.) Plaintiff told Dr. Benton that his foot pain is constantly getting worse and is increasing his back pain. (R. 715.) He also said that his hand goes numb over time and he has to stop and shake it to loosen it up. (*Id.*) He told Dr. Benton that he has migraine headaches "15 out of 30 days; and then there might be a month where [he does not] have one." (*Id.*) Plaintiff did not believe he was depressed, but later stated that he was a little overwhelmed. (R. 715–16.) Plaintiff reported racing thoughts, inattention, hyperactivity, and panic attacks. (R. 716.)

Plaintiff told Dr. Benton that he never missed a day of work due to pain; instead, he worked in spite of pain. (*Id.*) He became unable to work because of his condition, however, when he tore his Achilles in 2010. (*Id.*) Since then he has not tried to return to work. (*Id.*) Plaintiff reported being able to perform all necessary self-care activities of daily living without assistance, such as bathing, dressing, and eating. (*Id.*) He stated he can stand for thirty minutes with the help of a cane, walk 300–500 feet, and sit

for about sixty minutes. (*Id.*) Plaintiff can do limited cleaning, such as sweeping, mopping, and vacuuming, but that his sister occasionally helps him. (*Id.*) He can also drive for about an hour. (R. 717.)

Plaintiff said he could handle an hour of mowing and does little things in increments throughout the day to try to keep his property presentable. (*Id.*) He blows leaves off his deck with a leaf blower every other day, is trying to prepare a garden, is trying to clean up his dental lab, and drums for about thirty minutes a day. (*Id.*)

Dr. Benton noted that Plaintiff was well-groomed and dressed in jeans, a button front T-shirt, and cowboy-style boots. (*Id.*) Plaintiff walked with a limp and used a cane to ambulate. (*Id.*) His posture was unremarkable but pain behaviors included occasionally rearranging his position. (*Id.*) Plaintiff's mood was anxious but he had adequate and intact cognition. (R. 718.)

Dr. Benton diagnosed Plaintiff with panic disorder without agoraphobia, anxiety disorder not otherwise specified, and alcohol abuse in full sustained remission. (*Id.*) Regarding Plaintiff's ability to perform various work related mental activities, Dr. Benton opined Plaintiff "appears

to have adequate capacity in the areas of understanding and memory, concentration, persistence, social interaction and adaptation." (*Id.*) Plaintiff may benefit, however, from mental health counseling. (*Id.*)

Plaintiff continued treating with Dr. Fearing in March and May 2012 to discuss medications and obtain prescription refills. (R. 719–20, 739–40.) When he returned to see Dr. Fearing on July 19, 2012, Plaintiff requested a neurologist referral due to his severe migraine headaches. (R. 738.) He also reported continued chronic severe pain. (*Id.*)

Later, on August 29, 2012, Plaintiff had another MRI taken of his lumbar spine, thoracic spine, right ankle, and right knee, as well as an Orbit CT scan. (R. 723–29, 748.) The MRI of the lumbar spine revealed left paramidline disc herniation at L2–3 with caudal migration, moderate central stenosis at L4–5 partly due to midline disc protrusion, and lesser degenerative changes at other levels. (R. 719–20.) The MRI of the thoracic spine revealed three, mild, relatively old compression fractures of T6, T7, and T9. (R. 725.) There were no findings in other segments to indicate a narrow replacing process and no foramina were expanded or compromised. (*Id.*) Although the spinal canal was developmentally

somewhat smaller than average, the contour of the spinal cord was normal and revealed no signal abnormalities. (*Id.*)

The MRI of Plaintiff's right ankle revealed evidence of an old, healed calcaneal fracture with post-traumatic degenerative changes developing in the posterior subtalar joint and the calcaneocuboid articulation. (R. 726.) There were also accelerated degenerative changes in the talonavicular and tibiotalar articulations, which were likely the residua of old or chronic repetitive trauma. (R. 727.) No tendon tears, acute ligamentous tears, or acute fractures were identified. (*Id.*) Similarly, the MRI of Plaintiff's right knee revealed meniscus damage and possible tear, but intact ligaments. (R. 728, 737.) The Orbit CT scan was also unremarkable. (R. 748.)

At Plaintiff's follow-up visit with Dr. Fearing on September 12, 2012, Plaintiff stated that the increased dose of MS Contin was working well for his chronic pain, but that he continues to have severe recurrent migraines. (R. 737.) Dr. Fearing noted that Plaintiff "is applying for disability and I would recommend this for patient with chronic severe multiple arthritic problems." (R. 730.) Dr. Fearing further opined that Plaintiff "is unsuitable for any type of employment and feels that he will be chronically disabled."

(*Id.*)

Two days later, Plaintiff reported to Fit For Life Physical Therapy for a functional capacity evaluation by David Ochs, MPT. (R. 749–54.) Plaintiff showed up wearing tight fitted jeans and boots with a heel, prompting Mr. Ochs to explain that Plaintiff needs to wear tennis shoes secondary to the boots only making his pain worse. (R. 749.) Plaintiff reported that he does not drive anymore, and can only sit for thirty minutes, stand for ten minutes, and walk for twelve minutes. (*Id.*)

Mr. Ochs' examination revealed abilities that would place Plaintiff in a less than sedentary physical demand level of characteristics, meaning he could only occasionally lift ten pounds. (R. 750.) Plaintiff had limited right knee range of motion, decreased hip flexion and rotation range of motion, decreased range of motion of the trunk in all planes, decreased shoulder flexion and abduction, weakness to hand grip strength bilaterally, weak abdominals, gluteals, and hip flexors, and an antalgic gait on his right lower extremity. (*Id.*) Plaintiff also had limitations with functional mobility with walking with a cane. (*Id.*) He could only walk for five minutes and stand for ten minutes. (*Id.*) Plaintiff further had limited ability to raise his arms overhead for reaching. (*Id.*)

Validity testing for effort and reliability demonstrated that Plaintiff had fair reliability with inconsistencies and put forth fair effort with some inconsistencies. (*Id.*) For example, first, the visual analog scale score and the functional report score did not correlate, at 8.5 versus 6 respectively. (R. 751.) Secondly, non-organic Waddell's testing resulted in three out of five tests being positive for non-organic signs, such as vertical compression, trunk rotation, and non-anatomic palpation increasing pain. (*Id.*) Thirdly, Plaintiff's pain questionnaire resulted in an Oswestry back questionnaire score of eighty-four (84) percent, which indicates the person is either bed-bound or is exaggerating the symptoms. (*Id.*)

Mr. Ochs recommended that Plaintiff wear more supportive footwear with preferred cushion sole shoes instead of hard sole boots for less strain on the lower back and discs. (R. 750.) Mr. Ochs also opined that the more sedentary Plaintiff is the more painful he may become, so Plaintiff should continue to strive for a home exercise routine. (*Id.*)

Plaintiff continued treating with Dr. Fearing for back pain, hypertension, and migraines. Although Plaintiff went for an MRI of his brain on November 12, 2012, the results were negative. (R. 780.) At a follow-up with Dr. Fearing on February 28, 2013, Plaintiff stated that he is compliant

with all of his medications and that they have worked adequately for him. (R. 758.) In addition, his migraines were well controlled. (*Id.*) On April 25, 2013, Plaintiff again reported being complaint with all medications and that they were working adequately for his chronic pain. (R. 757.) Plaintiff told Dr. Fearing that he does limited exercise as tolerated to help with his blood pressure, cholesterol status, and chronic pain. (*Id.*) On June 20, 2013, Plaintiff reported that his medications were adequately controlling his pain. (R. 756.)

Plaintiff went for another MRI of his right ankle and cervical spine on August 16, 2013. (R. 782–88.) The right ankle MRI revealed progression of post-traumatic degenerative changes of the ankle and lateral aspect of the subtalar joint. (R. 783.) The cervical spine MRI showed multilevel degenerative cervical spondylosis. (R. 787.)

Following these MRIs, Plaintiff returned to see Dr. Fearing on September 11, 2013. (R. 789.) Dr. Fearing highly recommended that Plaintiff be seen by orthopedics to further evaluate the possibility of surgery to help alleviate Plaintiff's multiple symptoms. (*Id.*) Dr. Fearing stated that he would send a consult to the orthopedic spine specialist. (*Id.*) In the meantime, Dr. Fearing continued Plaintiff's same pain medications. (*Id.*)

Next, Plaintiff went for an evaluation at Interventional Medical Associates, LLC ("Interventional MA") on November 21, 2013. (R. 790–801.) Plaintiff described his neck, low back, and right leg pain as aching, usually a nine out of ten. (R. 790.) Medication, however, usually reduces the pain. (R. 791.) At the time, Plaintiff's medications included Imitrex, Maxalt, Oxycodone, Phenergan, Soma, Morphine Sulfate, Valium, and Trazadone. (*Id.*)

Examination of the cervical spine and lumbar spine revealed no erythema, swelling, deformity, or tenderness, normal spinal curves, no scoliosis, limited but normal range of motion, and 5/5 muscle strength in all major muscle groups. (R. 793.) Special tests for nerve root disease were negative. (*Id.*) Plaintiff's cervical flexion, extension, and rotation was, however, limited. (*Id.*) Plaintiff also had limited lumbar range of motion and lumbar spine tenderness. (*Id.*) Plaintiff was diagnosed with cervicobrachial syndrome, cervicalgia, lumbar disc displacement, thoracic/lumbar radiculitis, and chronic pain syndrome. (R. 794.)

Plaintiff continued treating with Dr. Fearing following his evaluation by Interventional MA. On December 5, 2013, Plaintiff reported that his medications were "working adequately at this time for his pain control." (R.

803.) Then, at his appointment on January 31, 2014, Plaintiff informed Dr.

Fearing that he underwent a functional capacity evaluation and had a

disability hearing scheduled for February 2014. (R. 802.) Plaintiff stated

that he was on his present medications and that they were working

adequately for his chronic severe pain. (*Id.*) Dr. Fearing's plan was for

Plaintiff to continue on his present medications and treatment plans and

continue regular follow-up every two months or sooner if needed. (*Id.*) Dr.

Fearing "highly recommended" Plaintiff "be evaluated for possible disability

due to his chronic pain." (*Id.*)

## B.  Opinion Evidence

On February 27, 2012, Kevin Ragsdale, Ph.D., a state agency

psychologist, completed a Psychiatric Review Technique ("PRT") for

Plaintiff. Susan Shapiro, Ph.D., another state agency psychologist,

completed a second Psychiatric Review Technique ("PRT") for Plaintiff on

May 9, 2012. Both Dr. Ragsdale and Dr. Shapiro opined that based on the

totality of the evidence, Plaintiff's "mental ability to do basic work activities

on a regular basis is not severely limited" despite his unspecified

arthropathies, migraines, anxiety disorders, and substance addiction

disorders. (R. 116–17, 142–44.)

On February 24, 2012, Patricia Voege, a state agency disability examiner, completed a physical residual functional capacity assessment for Plaintiff. Louise Wunsch, MD, a state agency physician, completed a second physical residual functional capacity assessment for Plaintiff on May 10, 2012. After reviewing Plaintiff's medical evidence, both Ms. Voege and Dr. Wunsch opined that Plaintiff could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk for 6 hours in an 8-hour workday, sit for 6 hours in an 8-hour workday, and had unlimited pushing and/or pulling limitations other than his lifting and carrying limitations. (R. 118–19, 145–47.)

## C. Hearing Testimony

At the hearing, Plaintiff agreed to amend his onset date to August 28, 2009, the date on which he turned fifty (50) years old. (R. 82.) At the time of the hearing, Plaintiff was fifty-four (54) years old. (R. 60.) Plaintiff testified that he is able to take care of himself, including bathing and dressing. (R. 66.) He can stand for 30 minutes with the assistance of a cane and sit for 60 minutes. (*Id.*) He has difficulty, however, vacuuming, doing laundry, and changing bed sheets. (R. 67.) Plaintiff's sister helps with most of the household chores. (R. 77.)

Plaintiff mows his law about four times a year using a riding mower, but can only stay on the mower for approximately an hour. (R. 68, 76.) In addition, he is able to use a leaf blower to blow leaves off the deck as long as he builds "some kind of vice" or uses a table because he can no longer crank start the blower. (R. 68.) Plaintiff also used to play drums and guitar, but is no longer able to because of his right wrist and right foot. (R. 72.) By the end of the day from moving around throughout the day, his right foot is swollen and throbbing. (*Id.*)

Despite notes in Plaintiff's pain management records about his travel to visit companies and attending dental training sometime from 2012 onward, Plaintiff says the notes are a mistake. (R. 70.) The ALJ also inquired about one of his functional capacity evaluations that questioned whether Plaintiff gave effort in the examination. (R. 72–73.) Plaintiff responded that one time he went for a functional capacity assessment, he was told not to take his medication, but another time he was told to take it. (R. 73.) He says he gets "a little loopy" when he takes his medication. (*Id.*) Plaintiff also said he wore cowboy boots to the assessment because he has worn cowboy boots all of his life. (*Id.*) He admits that at one point in the past, Dr. Kennedy told Plaintiff that he needs to get in some kind of flat

shoes. (*Id.*) Plaintiff said he tried flat shoes with gel inserts, but the flat shoes did not work because they did not give him side support like his boots do. (R. 73–74.) He also asserts that his cowboy boots are protective. (R. 74.)

Following Plaintiff's testimony, Dr. Hudson, testified as a medical expert in this case. Dr. Hudson is a board certified orthopedic surgeon, familiar with the Commissioner's documentation of listings. (R. 78.) After reviewing the exhibits in this case, Dr. Hudson opined that at age 50, Plaintiff would be unable to do light work due to the problems with his ankle. (R. 80.)  According to Plaintiff's MRIs from August 29, 2012, and August 16, 2013, Plaintiff had increased degenerative changes in the subtalar joint with a small osteochondroma. (R. 82–83.) Plaintiff could not walk six hours out of eight hours due to the degenerative changes. (R. 83.) In addition, Plaintiff could not sit some and then stand for approximately 30 minutes at a time because it would create so much pain, swelling, and inflammation that Plaintiff might not be capable of handling his job. (*Id.*) Plaintiff also has a medically necessary need for the cane he uses. (*Id.*) Dr. Hudson further opined that Plaintiff would have difficulties doing work that required the use of both hands while standing. (*Id.*) Nonetheless, Dr.

Hudson opined that Plaintiff could do sedentary work. (R. 80.)

Dr. Hudson did not see any limitations with respect to Plaintiff's back, knee, or hands that would reduce Plaintiff below the sedentary level. (R. 88.)  Dr. Hudson testified that the degenerative disk disease Plaintiff suffers from is the same severity as someone else Plaintiff's age because those are age-related changes. (R. 89.) The disk protrusions producing compromise and disk herniations affecting the nerve root, however, are degenerative changes in the spine that could cause pain. (R. 93.)

Similarly, Dr. Hudson said that the multilevel degenerative cervical spondylosis could affect Plaintiff's muscular functions, such as the biceps and some of the wrist extensions or affect sensation into the hand. (R. 94.) Those findings, however, were not present in the medical records. (*Id.*) And, with respect to Plaintiff's meniscus tear and the degenerative joint disease in Plaintiff's right knee, Dr. Hudson testified that these conditions would not limit Plaintiff's ability to sit for six hours with breaks, nor would those conditions prevent sedentary work. (R. 89.) Dr. Hudson explained that if the issues with Plaintiff's ankle were taken out of the equation, Plaintiff would be capable of performing light work except no overhead lifting. (R. 88.)

Finally, Rebecca Hayes, Vocational Expert ("VE Hayes"), testified that Plaintiff had past work as a dental technician, which is classified as light and skilled. (R. 86.) Plaintiff's skills are transferable to several sedentary jobs listed by the Dictionary of Occupational Titles, including dental ceramist, dental waxer, and dental ceramist assistant all of which are classified as sedentary and skilled jobs. (R. 86–87.)

## D.  The ALJ's Findings

The ALJ determined that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2013. (R. 30.) She further determined that Plaintiff had not engaged in substantial gainful activity since August 28, 2009. (*Id.*) The ALJ found that Plaintiff had the following severe impairments: degenerative disk disease, spinal stenosis, degenerative joint disease of the right foot and ankle, status post fracture, bilateral shoulder pain, meniscal tear of the right knee, and headaches. (*Id.*) At step three of the sequential evaluation, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments. (R. 32.)

With respect to Plaintiff's residual functional capacity at step four of the sequential evaluation, the ALJ determined that Plaintiff retained the

residual functional capacity ("RFC") to perform sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a), with limitations. (*Id.*) Specifically, the ALJ found that Plaintiff can lift and/or carry ten pounds, sit for six hours total in an eight-hour workday, with the ability to stand in place at his work station every hour for a short break under five minutes, and stand and/or walk for a total of two hours in an eight-hour workday. (*Id.*) Plaintiff cannot, however, perform overhead lifting or climbing of ladders, ropes, or scaffolds. (*Id.*) Plaintiff cannot kneel, crouch, or crawl. (*Id.*) He can occasionally climb ramps and stairs and can see, hear, and talk without limitation. (*Id.*) Plaintiff can use his hands frequently but cannot perform overhead lifting. (*Id.*) Plaintiff cannot tolerate concentrated exposure to extreme cold, extreme head, wetness, humidity, or vibration. (*Id.*) Finally, he can never be around workplace hazards, such as heights or moving machinery. (*Id.*)

The ALJ concluded that Plaintiff's medically determinable impairments could reasonably be expected to cause Plaintiff's alleged symptoms, but that Plaintiff's statements concerning the intensity, persistence, and limiting effects of his symptoms were not entirely credible for the reasons discussed in the ALJ's decision. (R. 36.) The ALJ

concluded at step four that Plaintiff was unable to perform any past relevant work. (R. 37.)  Nonetheless, considering Plaintiff's age, education, work experience, and RFC, the ALJ determined that Plaintiff has acquired work skills from past relevant work that are transferable to other occupations with jobs existing in significant numbers in the national economy. (R. 38.)   Accordingly, the ALJ concluded that Plaintiff has not been under a disability from August 28, 2009, through the date of the ALJ's decision. (*Id.*)

## IV.  DISCUSSION

Despite Plaintiff's 86-word run-on statement of the issue, the issues raised by Plaintiff on appeal are twofold.  First, Plaintiff argues that  the ALJ violated the Eleventh Circuit's pain standard. Second, Plaintiff says that substantial evidence does not support the ALJ's finding that Plaintiff could perform sedentary work. (ECF No. 14 at 2.)

In response, Defendant contends that substantial evidence supports the ALJ's credibility finding, as well as the ALJ's determination that Plaintiff can perform sedentary work. (ECF No. 15.) Based on an independent review of the record, the Court agrees that substantial evidence supports the ALJ's decisions.

A.     **Substantial evidence supports the ALJ's credibility finding.**

At step four the ALJ must assess the claimant's RFC and his ability to return to past relevant work. § 404.1520(a)(4)(iv). The ALJ must take the claimant's medical evidence and other evidence into consideration in his RFC analysis. § 404.1520(e). If a claimant cannot return to his past relevant work, the ALJ moves onto step five to determine if the claimant can adjust to other work. *Id.*; *Phillips v. Barnhart*, 357 F.3d 1232, 1238 (11th Cir. 2004).

In determining Plaintiff's RFC at step four, the ALJ determined that although Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision." (R. 36.) The ALJ was then required to consider Plaintiff's statements under the Eleventh Circuit's three-part pain standard.

Under the Eleventh Circuit's pain standard, a claimant may establish her disability through his own testimony of pain or other subjective symptoms. *See Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005); *Foote v. Chater*, 67 F.3d 1553, 1560–61 (11th Cir. 1995). The ALJ must

consider a claimant's testimony of pain and other subjective symptoms where the claimant meets the Eleventh Circuit's three-part "pain standard." *See Foote*, 67 F.3d at 1560. Under that test, evidence of an underlying medical condition must exist. *Id.* If that threshold is met, then there must be either objective medical evidence that confirms the severity of the alleged pain or symptoms arising from the underlying medical condition, or evidence that the objectively-determined medical condition is of such a severity that it can reasonably be expected to give rise to the alleged pain or symptoms. *Id.* A claimant's subjective testimony supported by medical evidence that satisfies the pain standard is sufficient to support a finding of disability. *Id.* at 1561.

If the record shows that the claimant has a medically-determinable impairment that could reasonably be expected to produce her symptoms, the ALJ must evaluate the intensity and persistence of the symptoms in determining how they limit the claimant's capacity for work. 20 C.F.R. § 404.1529(c)(1). In doing so, the ALJ considers all of the record, including the objective medical evidence, the claimant's history, and statements of the claimant and her doctors. *Id*. § 404.1529(c)(1)–(2). The ALJ may consider other factors, such as: (1) the claimant's daily activities; (2) the

location, duration, frequency, and intensity of the claimant's pain or other symptoms; (3) any precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of the claimant's medication; (5) any treatment other than medication; (6) any measures the claimant used to relieve her pain or symptoms; and (7) other factors concerning the claimant's functional limitations and restrictions due to her pain or symptoms. *Id.* § 404.1529(c)(3). The ALJ then will examine the claimant's statements regarding her symptoms in relation to all other evidence, and consider whether there are any inconsistencies or conflicts between those statements and the record. *Id.* § 404.1529(c)(4).

If the ALJ decides not to credit the claimant's testimony as to his subjective symptoms, the ALJ must articulate explicit and adequate reasons for doing so, or the record must be obvious as to the credibility finding. *See Foote*, 67 F.3d at 1561–62. While the ALJ does not have to cite particular phrases or formulations, broad findings that a claimant was incredible and could work are, alone, insufficient for the Court to conclude that the ALJ considered the claimant's medical condition as a whole. *Id*. at 1562. The ALJ's articulated reasons must also be supported by substantial evidence. *Jones v. Dep't of Health & Human Servs*., 941 F.2d 1529, 1532

(11th Cir. 1991). The Court will not disturb a properly articulated credibility finding that is supported by substantial evidence. *Foote*, 67 F.3d at 1562. The failure to articulate reasons for discrediting a claimant's subjective testimony, however, requires that the testimony be accepted as true and becomes grounds for remand where credibility is critical to the outcome of the case*. Id.*

The ALJ is not required to recite the pain standard, but she must make findings that indicate the standard was applied. *Cooper v. Comm'r of Soc. Sec.*, 521 F. App'x 803, 807 (11th Cir. 2013). Whether objective medical impairments could reasonably give rise to the alleged pain is a question of fact for the Commissioner and the district court's review is limited to ensuring substantial evidence supports the Commissioner's finding. *Landry v. Heckler*, 782 F.2d 1551, 1553 (11th Cir. 1986).

In this case at step four, the ALJ determined that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." (R. 36). Thus, the ALJ found evidence of an underlying impairment under the first prong of the pain standard, such as: degenerative disk disease, spinal stenosis, degenerative joint disease of the right foot and ankle, status post fracture, bilateral shoulder pain,

meniscal tear of the right knee, and headaches. The ALJ also surmised that Plaintiff "certainly has limitations . . . ." (R. 37.) Consequently, under the second prong, the ALJ was required to consider the credibility of Plaintiff's testimony regarding pain. *Lamb v. Bowen*, 847 F.2d 698, 702 (11th Cir. 1988). After reviewing and considering all of the evidence the ALJ concluded that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision." (R. 36.)  As discussed below, the Court concludes that for the following reasons, substantial evidence supports the ALJ's reasons for discrediting Plaintiff's statements.

First, as she is entitled to do, the ALJ considered Plaintiff's activities of daily living in assessing Plaintiff's credibility. *See* 20 C.F.R. § 404.1529(c)(3) (in addition to the objective medical evidence and the claimants statements, the ALJ may consider other factors such as the claimant's daily activities). The ALJ emphasized that Plaintiff reported to Dr. Benton that he was capable of performing a wide array of daily activities. The ALJ also pointed to and relied upon Plaintiff's testimony at the hearing that he could mow the yard, take care of himself, and was able to have a garden as recently as 2012.

An independent review of the record evidences that there was substantial evidence supporting the ALJ's determination that Plaintiff's activities of daily living were inconsistent with his claims that he could not do any work. For example, after Plaintiff's alleged onset date, Plaintiff reported plans to travel to Atlanta and North Carolina for an educational trip by car. (R. 463, 528.) Then, in December 2009, Plaintiff told Dr. Fearing that his daily activities included playing the drums and doing sit ups. (R. 701.) On February 22, 2012, Plaintiff stated he could drive for about an hour, was trying to clean up his dental lab, and played the drums for thirty minutes per day. (R. 716–17.) In April 2012, Plaintiff reported going outside as much as possible and being able to take care of himself and his animals. (R. 380.) Although Plaintiff could no longer drive at that point, he admitted that the reason was because of the amount of medications he was taking. (*Id.*)

Additionally, as of the date of his hearing, Plaintiff was able to perform all the necessary self-care activities of daily living without assistance. (R. 66, 716.) Plaintiff's medical records consistently disclose that Plaintiff appears for appointments well-groomed and presentable. Although Plaintiff may have recently encountered difficulty vacuuming, he

told Dr. Benton he could do other limited cleaning, such as sweeping and

mopping. (R. 716.) Plaintiff further admitted that he also is capable of

mowing the lawn, albeit it in limited segments, and can use the leaf blower

to blow off his porch, provided he props it up on a table to start the blower.

(R. 68.) In addition, as recently as April 25, 2013, Plaintiff reported doing

limited exercise as tolerated to help with his blood pressure, cholesterol,

and chronic pain. (R. 758.)  All of these activities suggest that Plaintiff's

medical conditions and pain may not be as limiting as alleged.

   In assessing Plaintiff's credibility, the ALJ also considered and relied

upon evidence that Plaintiff initially stopped working for reasons other than

his condition, thus, suggesting that Plaintiff's condition may not be the

reason for his discontinued employment.

   Specific evidence supporting this finding include Dr. Chodosh's

evaluation. The evaluation Plaintiff admitted that he stopped working after

having a disagreement with his employer. (R. 710.) Plaintiff went on to

explain that he was unable to return to work afterwards because of a loss

of motor skills. (*Id.*) But, only eight days later, Plaintiff told Dr. Benton that

he became unable to work when he tore his Achilles and that he has not

tried to return to work since. (R. 716.)  And while Plaintiff told Dr. Chodosh

he cannot work because of his motor skills, Dr. Chodosh's examination of Plaintiff revealed that Plaintiff's motor function was grossly normal and all four extremities exhibited a 5 out of 5 regarding strength, including grip. Further, Plaintiff's manual dexterity was normal, and Plaintiff had good coordination. (R. 712.) Considering Plaintiff testified that he is able to dress without any assistance, the fact that he wore jeans and a button-front t-shirt to his evaluation with Dr. Benton and tight fitting jeans to his evaluation with Mr. Ochs suggests that Plaintiff's motor skills are adequate enough to manage buttons and put on tight fitting jeans.

Moreover, to the extent Plaintiff claims he cannot work because of chronic, severe pain, Plaintiff reported to Dr. Benton that he never missed a day of work due to pain and instead, worked in spite of pain. And, as mentioned, Plaintiff told Dr. Chodosh that he could not work due to a loss of motor skills. While these inconsistent statements may not  be the result of a conscious intent to deceive anyone, it is nonetheless the province of the ALJ to resolve conflicts in the evidence. *Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986).

Second, in addition to Plaintiff's activities of daily living, the ALJ relied upon opinion evidence that is at odds with Plaintiff's statements about the

limitations imposed by his pain. *See* 20 C.F.R. §§ 404.1529(c)(1),

416.929(c)(1) (explaining that in  evaluating the intensity and persistence

of a claimant's symptoms, the Commissioner considers all of the available

evidence, including the "medical opinions of your treating source and other

medical opinions").  Specifically, the ALJ gave Dr. Chodosh and Dr.

Hudson's opinions "great weight" because the opinions were supported by

the medical evidence of record. (R. 36.)

For example, Dr. Chodosh's examination did not reveal any

deformities, tenderness, or paraspinal muscular spasm in Plaintiff's

back/spine. (R. 712.) Plaintiff's motor function was grossly normal and

Plaintiff had 5 out of 5 strength, including grip, in all four extremities. (*Id.*)

Plaintiff's manual dexterity was normal and Plaintiff had good coordination.

(*Id.*) Despite Plaintiff's slow walking with small, painful steps, Plaintiff was

nonetheless able to walk without using an assistive device and his

standing balance was normal. Further, Plaintiff's bilateral range of motion

throughout his body was normal other than the lumbar spine and right

great toe, which had somewhat decreased ranges of motion. (R. 706–08.)

Accordingly, based solely on objective evidence, Dr. Chodosh opined that

Plaintiff can "stand, walk, sit, and bend at the waist," and "squat, knee, lift,

carry, [and] handle objects." (R. 713.)

Similarly, Dr. Hudson, a board certified orthopedic surgeon, testified at the hearing that although Plaintiff's conditions could cause pain, those conditions would not preclude Plaintiff from performing sedentary work. In reaching this opinion Dr. Hudson pointed to specific objective medical evidence supporting his position. For example, although the MRIs of Plaintiff's right ankle revealed increased degenerative changes in the subtalar joint with a small osteochondroma (which Dr. Hudson acknowledged would prevent Plaintiff from performing light work), the degenerative changes would not preclude Plaintiff from performing sedentary work. (R. 82–83.)

Likewise, Dr. Hudson concluded that the  degenerative disk disease in Plaintiff's spine, disk protrusions producing compromise, and disk herniations affecting the nerve root would not preclude Plaintiff from sedentary work. (R. 88–89, 93.)  Nor would the meniscus tear and degenerative joint disease in Plaintiff's right knee. (R. 89.) And, despite the fact that the multilevel degenerative cervical spondylosis could affect Plaintiff's muscular functions or sensation in his arms and hands, those findings were not present in the medical records. (R. 94.) In short, Dr.

Hudson and Dr. Chodosh's opinions fully support the ALJ's finding that while Plaintiff has pain that limits his functional abilities, Plaintiff's pain is not so severe as to preclude him from performing sedentary work.

Third, in discounting Plaintiff's testimony that he cannot do work at any functional level, the ALJ pointed to substantial objective medical evidence that supported her credibility finding throughout her RFC explanation. *See Dyer v. Barnhart*, 395 F.3d 1206, 12111 (11th Cir. 2005) ("[T]here is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision, so long as the ALJ's decision . . . is not a broad rejection which is 'not enough to enable the district court or this Court to conclude that the ALJ considered her medical condition as a whole.'"). A lack of medical reports indicating exertional limitations suggests that a claimant's impairments may not be as limiting as alleged. *See Sellers v. Barnhart*, 246 F. Supp. 2d 1201, 1211 (M.D. Ala. 2002) (finding that substantial evidence supported the ALJ's conclusion that plaintiff's impairments were not severe because there were no reports indicating exertional limitations).

In addition to the objective medical evidence discussed by Dr. Chodosh and Dr. Hudson, the ALJ also pointed to other medical evidence

to further supported her determination. For example, the ALJ referred to

Dr. Benton's examination in February 2012 that revealed adequate

capacity in understanding, memory, concentration, persistence, social

interaction and adaptation despite Plaintiff's panic disorder and anxiety. (R.

34, 718.) The ALJ also referenced Plaintiff's physical functional capacity

evaluation in September 2012, which revealed fair reliability and effort with

inconsistencies. (R. 35, 750–51.) The ALJ further cited the November 2013

evaluation by Interventional MA, which revealed no scoliosis, a normal

range of motion in the lumbar spine, 5 out of 5 muscle strength, no nerve

root issues, and a full range of motion in the elbow, wrist, hip, and knee.

(R. 35, 793.)

The ALJ also appropriately considered Plaintiff's pain medication in

assessing Plaintiff's complaints of pain. *See* 20 C.F.R. § 404.1529(c)(3)

(the ALJ must consider "[t]he type, dosage, effectiveness, and side effects

of any medication" the claimant takes or has taken to alleviate the

claimant's pain and other symptoms). The ALJ acknowledged Plaintiff's

pain medications, their effectiveness, and the lack of side effects

throughout her chronological RFC explanation. (R. 33–35.)  Notably,

despite Plaintiff's argument that "[s]ubstantial evidence, in the form of

years and years of opioid prescriptions refutes the ALJ's findings," (ECF No. 14 at 10), recent medical records demonstrate that Plaintiff's pain symptoms have been adequately controlled by the medications. (R. 756–58, 791, 802–03.) *See Parks v. Comm'r of Soc. Sec.*, 353 F. App'x 194, 197 (11th Cir. 2009) (record supported ALJ's credibility determination where the medical evidence showed plaintiff's medication reasonably controlled her pain); *Schuhardt v. Astrue*, 303 F. App'x 757, 760 (11th Cir. 2008) (substantial evidence, including that plaintiff's Percocet medication provided ten to twelve hours of relief, supported ALJ's finding that claimant's pain testimony was not credible).

The ALJ also addressed treating physician Dr. Fearing's opinion that Plaintiff "is unsuitable for any type of employment," and "will be chronically disabled." The ALJ correctly noted, however, that Dr. Fearing based his opinion on Plaintiff's self-reported subjective statements and that Dr. Fearing never provided functional limitation findings to support his opinion. *See Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1159 (11th Cir. 2004) ("A treating physician's report 'may be discounted when it is not accompanied by objective medical evidence or is wholly conclusory.'"). In this case, Dr. Fearing's opinion that Plaintiff is unsuitable for any type of

employment and will be chronically disabled is wholly conclusory.

Dr. Fearing's subsequent opinion on September 12, 2012, that

Plaintiff should "be evaluated for possible disability due to his chronic pain,"

further undermines Dr. Fearing's initial opinion that Plaintiff is

unemployable. (R. 730, 802.) *See Crawford*, 363 F.3d at 1159 (treating

physician's opinion of permanent disability was inconsistent with his own

treatment notes and unsupported by the medical evidence where following

disability conclusion, treating physician noted that plaintiff was improved

and doing well). Indeed, Plaintiff informed Dr. Fearing on five different

occasions *after* September 12, 2012, that the pain medications were

adequately controlling Plaintiff's pain. (R. 756–58, 802–03.) Then, on

September 11, 2013, Dr. Fearing recommended that Plaintiff be seen by

orthopedics to further evaluate the possibility of surgery to help alleviate

Plaintiff's multiple symptoms. (R. 789.) Dr. Fearing's own notes

demonstrate that the pain medications were working adequately and that

surgery may help further alleviate some of Plaintiff's pain. *See Edwards v.*

*Sullivan*, 937 F.2d 580, 584 (11th Cir. 1991) (good cause existed to reject

treating physician's opinion because doctor failed to provide clinical data to

support his opinion, physician's opinion was contradicted by other

notations in his records, and physician conceded that he was not sure he could objectively assess the plaintiff's condition). Dr. Fearing's initial opinion that Plaintiff is unsuitable for employment and will be permanently disabled was nothing more than conclusory and contradicted his later opinion and notations. Accordingly, there was good cause for the ALJ to reject Dr. Fearing's opinion.

Finally, despite evidence of migraines, Plaintiff's August 2012 Orbit CT scan was unremarkable and the November 2012 MRI of Plaintiff's brain was negative. (R. 748, 780.) Thus, the medical records demonstrate that Plaintiff's migraine medication works adequately in controlling his pain.

As the ALJ stated, Plaintiff certainly has limitations, including a history of pain. The ALJ was not required, however, to find Plaintiff disabled simply because he has pain and takes prescription pain medications. The ALJ did not reject Plaintiff's claims of pain as Plaintiff contends. Instead, the ALJ concluded that Plaintiff's pain—while real and present— was not as limiting as Plaintiff alleged. The pain was sufficiently severe to preclude Plaintiff from performing light work and from performing his past relevant work but not sufficient to prevent Plaintiff from performing sedentary work.  The ALJ has wide latitude in evaluating the weight of

evidence, particularly the credibility of witnesses. *Owens v. Heckler*, 748

F.2d 1511, 1514 (11th Cir. 1984). Where, as here, substantial evidence

supports the ALJ's credibility determinations, the Court should not overturn

the ALJ's findings, even if the Court may have reached a different

determination had the Court been required to weigh the evidence in the

first instance.

## B.  Substantial evidence supports the ALJ's finding that Plaintiff has the RFC to perform sedentary work.

After determining that Plaintiff's statements about disabling pain and

the limiting effects of the pain were not entirely credible, the ALJ

determined that Plaintiff is unable to perform past relevant work because

Plaintiff's past work is classified as light work. The ALJ concluded,

however, that Plaintiff is capable of performing sedentary work, subject to a

restriction on overhead lifting or climbing ladders, ropes, or scaffolds. (R.

32.) The ALJ also concluded that Plaintiff can occasionally climb ramps

and stairs, see, hear, and talk without limitations, and frequently use his

hands. (*Id.*) The ALJ found, however, that Plaintiff cannot tolerate

concentrated exposure to extreme cold, extreme heat, wetness, humidity,

or vibration and can never be around workplace hazards such as heights

or moving machinery. (*Id.*)

As discussed, substantial evidence supports the ALJ's determination that Plaintiff's pain may not be as limiting as alleged. Thus, while Plaintiff argues that he is unable to perform sedentary work because his pain prohibits him from being productive in the dental lab, the only relevant question here is whether substantial evidence supports the ALJ's determination that Plaintiff has the RFC to perform sedentary work.

A claimant's RFC is the most a claimant can do, despite his limitations. 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The RFC is based, not only on medical opinions, but also the ALJ's review of all relevant evidence in the record. *Id.*; 20 C.F.R. §§ 404.1546, 416.946.

Under SSR 83-10, "sedentary work" is defined as:

lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although sitting is involved, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. By its very nature, work performed primarily in a seated position entails no significant stooping. Most unskilled sedentary jobs require good use of the hands and fingers for repetitive hand-finger actions.

Additionally, SSR 83-10 defines "occasionally" as:

occurring from very little up to one-third of the time. Since being on one's feet is required "occasionally" at the sedentary level of exertion, periods of standing or walking should generally total no more than about 2 hours of an 8-hour workday, and sitting should

generally total approximately 6 hours of an 8-hour workday. Work processes in specific jobs will dictate how often and how long a person will need to be on his or her feet to obtain or return small articles.

In this case, substantial objective medical evidence and opinion evidence supports the ALJ's finding that Plaintiff has the RFC to perform sedentary work. For example, the ALJ pointed to Plaintiff's early medical records with Dr. Leber, which demonstrate that Plaintiff can sit, stand, walk, and maintains active movement in all four extremities, despite Plaintiff's complaints of chronic low back pain. Dr. Leber found that Plaintiff did not have any crepitus and he could fully squat and move from sitting to standing with discomfort but without difficulty. The ALJ gave Dr. Leber's opinion "greater weight" because it was supported by the medical record on the whole. (R. 37.)

The ALJ also relied upon Dr. Chodosh's February 2012 examination, which revealed five out of five muscle strength in all muscle groups, no edema, no muscle spasm, negative straight leg raising, and that Plaintiff had the ability to walk without an assistive device. (R. 34.) The record further demonstrates that Plaintiff's bilateral range of motion throughout his body was normal other than the lumbar spine and right great toe. (R. 706–08.) Although Plaintiff had limited range of motion in the lumbar spine,

he was nonetheless able to reach 80 degrees on a scale of 90 degrees during forward flexion and 15 degrees on a scale of 25 degrees during lumbar extension. (R. 706.)  Moreover, Plaintiff's standing balance was normal and Dr. Chodosh's  evaluation noted that Plaintiff had unremarkable posture. (R. 712, 717.) Thus, the ALJ gave "great weight" to Dr. Chodosh's opinion that Plaintiff can stand, walk, sit, bend, squat, kneel, lift, carry, and/or handle objects. (R. 36.)

The ALJ further pointed to the November 2013 examination of Plaintiff's cervical and lumbar spine by Interventional MA, which revealed that Plaintiff did not have any scoliosis, his muscle strength was five out of five muscle and there were no nerve root issues. (R. 35.)  The examination also disclosed that Plaintiff had full range of motion in his elbow, wrist, hip, and knee. (*Id.*) The record further demonstrates that despite the degenerative changes in Plaintiff's lumbar and cervical spine and their respective limited ranges of motion, Plaintiff had normal spinal curves and no signs of erythema, swelling, or deformities. (R. 793.) The ALJ gave "great weight" to the testing done at Interventional MA because it evidenced that while Plaintiff has some limitations with his back, he still maintains range of motion and muscle strength, and did not show

functional limitations with his upper extremities or his hips and knees. (R. 37).

Although Plaintiff's medical records reveal evidence of three, mild, relatively old compression fractures in Plaintiff's thoracic spine, there were no findings in other segments to indicate a narrow replacing process, no foramina were expanded or compromised, the contour of the spinal cord was normal, and there were no signal abnormalities. (R. 725.)

Despite Plaintiff's healed calcaneal fracture with post-traumatic degenerative changes in the subtalar joint and accelerated degenerative changes in the talonavicular and tibiotalar articulations, an MRI in August 2012 was negative for tendon tears, acute ligamentous tears, and acute fractures. (R. 727.)  And while there is evidence of meniscus damage in Plaintiff's knee, Plaintiff has intact ligaments. (R. 728, 737.)  Notably, Plaintiff can also walk without using an assistive device and has normal standing balance. (R. 712.)

The objective medical records do not suggest that Plaintiff is functionally limited with respect to his wrist.  Although Plaintiff suffered a right distal radius fracture in September 2008, Dr. Chodosh's February 2012 examination revealed that Plaintiff had 5 out of 5 strength in all four

extremities, including grip, Plaintiff's manual dexterity was normal, and Plaintiff had good coordination. (R. 454, 712.)

The ALJ also gave "significant weight" to Dr. Benton's opinion that Plaintiff "appears to have adequate capacity in the areas of understanding and memory, concentration, persistence, social interaction and adaptation." (R. 718.)  Plaintiff admitted to Dr. Benton that he has the ability to pay bills, handle a savings account, count change, and use a checkbook/money orders.  (R. 381–82.)  Plaintiff also does not need reminders to go places. (R. 382.) Further, although Plaintiff visits his friends less now due to the lengthy distances between them, he nonetheless still has friends and engages in social activities when they are able to visit him. (R. 383.)  Plaintiff admits that he has a normal attention span, finishes what he starts, and follows written and spoken instructions. (R. 383.) Further, other than having to change things because of his pain, Plaintiff doe not seem to have a problem handling changes in routine. (R. 384.)

As discussed above, the ALJ gave "great weight" to Dr. Hudson's opinion that Plaintiff could perform sedentary work. (R. 37.) Dr. Hudson did not find any limitations with respect to Plaintiff's back, knee, or hands that

would reduce Plaintiff below the sedentary level. (R. 88.)  Dr. Hudson

explained that while Plaintiff has degenerative disk disease the severity of

the disk disease is no different from someone else Plaintiff's age, who

have also experienced age-related changes. (R. 89.) And while Dr. Hudson

admitted that degenerative cervical spondylosis could affect muscular

functions, he found that those findings were not present in Plaintiff's

medical records. (R. 94.)  Dr. Hudson explained that neither Plaintiff's

meniscus tear nor the degenerative joint disease in Plaintiff's right knee

would limit his ability to sit for six hours with breaks or from otherwise

performing sedentary work. (R. 89.)

Although Plaintiff argues that substantial medical evidence does not

support the conclusion that he could sit six hours a day, Plaintiff fails to

point to any objective medical records demonstrating that Plaintiff is unable

to sit for six hours a day. While Plaintiff recites the various diagnoses from

Dr. Swords, Dr. Leber, and Dr. Fearing, Plaintiff fails to point to any

evidence suggesting how these diagnoses prevent him from sitting for six

hours a day. *See Trenary v. Bowen*, 898 F.2d 1361, 1364 (8th Cir. 1990)

(the proper focus in determining a claimant's RFC, however, is the

claimant's functional limitations, not the diagnosis).

Plaintiff's medical records predominantly demonstrate functional limitations with respect to standing and walking. Dr. Hudson touched on this during his testimony, opining that if it were not for Plaintiff's ankle, Plaintiff likely would be capable of performing light work with overhead limitations. (R. 88.)  Under the regulations, light work may involve "a good deal of walking or standing." §§ 404.1567(b), 416.967(b). Thus, it is not "preposterous" to find, as Plaintiff argues, that Plaintiff can perform highly skilled bench work at the sedentary level but cannot perform highly skilled bench work at the light level. Plaintiff's argument fails to take into account that light work can involve significantly more standing or walking.

Furthermore, to the extent Plaintiff relies on Dr. Fearing's opinion that Plaintiff is unemployable and will be chronically disabled, Dr. Fearing did not perform any independent objective testing to support these findings, predominantly prescribed pain medications, and based his opinion on Plaintiff's statements.  Because of these shortcomings the ALJ appropriately gave no weight to Dr. Fearing's opinion. (R. 36.)  There is also no indication that Dr. Fearing considered whether Plaintiff's skills were transferable to other jobs despite Plaintiff's limitations.  As the ALJ pointed out, Dr. Fearing provided contradictory opinions by later stating that

Plaintiff should be evaluated for possible disability.

In sum, Plaintiff's argument that he cannot perform sedentary work is premised on the assertion that pain precludes him from sitting for six hours a day.  But, the ALJ found Plaintiff's complaints of pain and the limiting effects of the pain not entirely credible. Instead, despite Plaintiff's pain, the objective medical evidence and opinion evidence demonstrates that Plaintiff can perform sedentary work. Substantial evidence supports the ALJ's conclusions and, therefore, the ALJ's decision should be affirmed.

## V.  RECOMMENDATION

In view of the foregoing, it is respectfully **RECOMMENDED** that the decision of the Commissioner should be **AFFIRMED**.

**IN CHAMBERS** in Gainesville, Florida, on the 23rd  day of August, 2016.

_s/Gary R. Jones_
GARY R. JONES
United States Magistrate Judge

## NOTICE TO THE PARTIES

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof. <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u> A**

copy of objections shall be served upon all other parties. If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions. *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.